868 A.2d 1034 (2005)
375 N.J. Super. 485
In the Matter of P.L.2001, Chapter 362.
Richard J. WILLIAMS, in his official capacity as Administrative Director of the Courts, Plaintiff-Respondent,
v.
The STATE of New Jersey, Defendant-Appellant, and
Probation Association of New Jersey, and Probation Association of New Jersey Professional Supervisors Union, Intervenors-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 12, 2005.
Decided February 18, 2005.
*1036 Andrea J. Sullivan, Woodbridge, argued the cause for appellant State of New Jersey in A-3370-03T3 (Greenbaum, Rowe, Smith & Davis, attorneys; Paul A. Rowe, of counsel, Ms. Sullivan, and Emily A. Kaller, on the brief).
David I. Fox, Livingston, argued the cause for appellants Probation Association of New Jersey and Probation Association of New Jersey Professional Supervisors Union in A-3389-03T3 (Fox and Fox, attorneys; Mr. Fox and Dena E. Epstein, Morristown, of counsel and on the brief).
Cynthia M. Jacob, Somerset, argued the cause for respondent in both appeals (Collier, Jacob & Mills, attorneys; Ms. Jacob, of counsel, and David J. Treibman, on the brief).
Before Judges WEFING, FALL and PAYNE.
The opinion of the court was delivered by
FALL, J.A.D.
Public Law 2001, Chapter 362 (the "Act"), codified in part as N.J.S.A. 2B:10A-1 to -3 and amending N.J.S.A. 2C:39-6, establishes within the Administrative Office of the Courts a "Probation Officer Community Safety Unit," consisting of no less than 200 probation officers who shall be authorized to carry a firearm in accordance with N.J.S.A. 2C:39-6c(17) and rules to be adopted by the Supreme Court of New Jersey. The Act grants those probation officers in the Probation Officer Community Safety Unit the authority to arrest, detain and transport probationers and to enforce the criminal laws of this State. The Act further requires the Administrative Director of the Courts to report to the presiding officers of the New Jersey Senate and General Assembly within eighteen months of its effective date as to the effectiveness of the Probation Officer Community Safety Unit.
In these back-to-back appeals consolidated for opinion purposes, defendant State of New Jersey and intervenors Probation Association of New Jersey and Probation Association of New Jersey Professional Supervisors Union (collectively, "PANJ"), appeal from entry of an order in the Law Division on January 20, 2004, granting summary judgment in favor of plaintiff, Richard J. Williams, in his official capacity as Administrative Director of the Courts, declaring the Act unconstitutional under the separation-of-powers clause of the Constitution of the State of New Jersey, and thereby void. In A-3389-03T3, PANJ also appeals from those portions of the January 20, 2004 order denying their motion to dismiss the complaint or alternatively transferring the matter to an independent, neutral third party for resolution; denying their motion to compel arbitration and for a stay of the Law Division action pending that arbitration; dismissing their counterclaim; and denying their cross-motion for summary judgment. PANJ further appeals from that portion of an order entered on February 4, 2003, denying their application for status as party defendants and designating them as permissive intervenors pursuant to R. 4:33-2.
After analyzing the record in the light of the written and oral arguments presented *1037 by the parties, we concur with the trial court's conclusion that the Act is void as constituting an impermissible infringement on the plenary constitutional authority of the Supreme Court to make rules concerning the administration of the courts, violative of N.J. Const., Art. III, ¶ 1.
We reject the contention by PANJ that the trial court erred in declining to submit the issue of comity and constitutionality of the Act to arbitration. It is clear that the facial validity of legislation is not subject to arbitration. PANJ's argument that the validity of the Act must be determined by an impartial arbitrator or entity other than the judiciary is without merit. Absent federal court jurisdiction, the doctrine of necessity requires state court judicial review of the validity of the Act. The remaining contentions of PANJ are without merit and will be discussed infra.
The following procedural and factual history is relevant to our consideration of the issues advanced on appeal. On April 23, 2002, plaintiff filed a complaint, captioned "In the Matter of P.L.2001, Chapter 362," seeking a judgment declaring L. 2001, c. 362 unconstitutional on the grounds that it impinged upon powers granted the Judiciary by the New Jersey Constitution thereby violating the separation of powers clause of the Constitution. N.J. Const. Art. III, ¶ 1.
PANJ moved, on May 2, 2002, for entry of a consent order permitting it to intervene. According to plaintiff, although the court never entered a formal order, PANJ was permitted to intervene on consent of plaintiff and the State.
By order issued on June 14, 2002, the trial court ordered the re-captioning of the complaint to specifically name Richard J. Williams, in his official capacity as Administrative Director of the Courts, as plaintiff, and the Legislature of the State of New Jersey, by and through Richard J. Codey and John O. Bennett, in their official capacities as Presidents of the Senate and Albio Sires, in his official capacity as Speaker of the Assembly, as defendants. An amended complaint was filed on June 20, 2002.
On July 22, 2002, PANJ filed a notice of removal of the matter to the United States District Court for the District of New Jersey. After a hearing on plaintiff's motion to remand held before Judge Anne E. Thompson on September 18, 2002, the court ordered that the matter be remanded to the Superior Court of New Jersey for lack of federal jurisdiction.
On October 30, 2002, plaintiff forwarded a proposed consent order to the Law Division seeking to delete the named legislative defendants and to replace them with the State of New Jersey as defendant. PANJ opposed the consent order, urging that "if the State of New Jersey is named as a defendant in this matter, in effect the plaintiff and the defendant would be the same entity." Counsel for the State expressed support for the consent order.
During a December 6, 2002 telephone conference pertaining to PANJ's opposition to the consent order, Judge Linda R. Feinberg tentatively decided that "because the statute [L. 2001, c. 362] has been duly enacted, and because the State is the one who would be authorized and given the authority to enforce it, ... the State is the appropriate party." Over objection of plaintiff's counsel and with no objection being interposed by the State, counsel for PANJ requested that his clients be made party defendants. The judge directed the briefing of that issue.
In a written opinion dated December 6, 2002, Judge Feinberg formalized her tentative oral decision concerning the status of the State and indicated that she intended to sign the proposed consent order. An *1038 order embodying the foregoing was entered on January 6, 2003.
Plaintiff filed a second amended complaint, naming the State as defendant, on January 10, 2003. The State filed an answer dated January 21, 2003, denying the material allegations of the complaint and containing five affirmative defenses.
In a January 21, 2003 written opinion, Judge Feinberg reiterated her determination that the State of New Jersey was the appropriate defendant, denied PANJ's request to be designated as party defendants, ruled that PANJ would remain as permissive intervenors, and denied plaintiff's request that PANJ be dismissed from the action. The judge reasoned, as follows:
Permissive intervention is to be liberally construed by trial courts, with a view to whether intervention will unduly delay or prejudice the adjudication of rights of the original parties and whether intervention will eliminate the need for subsequent litigation. The court recognizes that PANJ's members do have an interest in the outcome of this litigation and as such PANJ was permitted to intervene in the action.
PANJ has not demonstrated that there currently exists a [justiciable] controversy for which it should be granted status as a defendant, and in addition has not established that it holds a position that cannot be adequately represented by the State. Therefore, the court denies PANJ's request to be granted status as a defendant in this action. In addition, the court denies the AOC's request that PANJ be dismissed from this action. Accordingly, PANJ will maintain its current status of intervenor in the action.
[Citations omitted.]
An order memorializing that ruling was entered on February 4, 2003.
On March 25, 2003, PANJ filed an answer that denied the material allegations of the second amended complaint and contained sixteen affirmative defenses and a five-count counterclaim. Count one of the counterclaim sought injunctive relief restraining state court action while a special master and/or neutral third party decided the matter, a declaratory judgment that plaintiff's actions violated the due process clause of the United States Constitution, and injunctive relief requiring implementation of the Act. Counts two, three and four sought similar injunctive relief. Count five also sought injunctive relief and demanded that the matter be referred to a neutral arbitrator.
On March 25, 2003, plaintiff moved for summary judgment, seeking an order declaring the Act unconstitutional under the New Jersey Constitution. Appended to plaintiff's brief in support of the motion were AOC Directive # 10-73, dated May 15, 1974; an Administrative Ruling issued by the Supreme Court on April 28, 1994, captioned "In the Matter of Proceedings Concerning Probation Officers' Membership in Law Enforcement Organizations and Proposed Affiliation of PANJ with the New Jersey State Policemen's Benevolent Association, Inc."; and AOC Directive # 6-97, dated April 28, 1997.
AOC Directive # 10-73 provided:
The Supreme Court has reviewed the matter of Probation Officers' carrying weapons in the regular performance of their work. The Court directed that Probation Officers not be permitted to carry weapons.
Probation work is the guidance and assistance to persons under investigation and supervision, and not law enforcement. It is suggested that where Probation Officers occasionally find themselves exposed to hazardous conditions during the course of their work, *1039 they use measures other than the carrying of firearms. They should consider traveling in pairs or requesting a police officer to accompany them on those occasions.
The Administrative Ruling dated April 28, 1994, issued after five days of hearings before a Special Master and the submission of the Special Master's report, stated in part:
The Court has been asked to review its long-standing policy prohibiting probation officers from becoming members of law enforcement organizations along with the related issue of the propriety of the proposed affiliation of the Probation Association of New Jersey (PANJ) with the Policemen's Benevolent Association of the State of New Jersey (PBA).
* * * *
Our decision rests on the fundamental difference between probation and police organizations. Probation is an integral part of the judiciary; everything that probation does it does as an arm of the judiciary. Among other things, it is the entity that enforces judicial orders. Given the nature and functions of probation, it must be as impartial as the rest of the judiciary, totally so and scrupulously so. Probation cannot take sides any more than a court may and cannot be perceived as taking sides any more than a court may. It is not pro-this or anti-that, it is not on the side of either men and fathers or women and mothers, it is not on the side of either parents or children, not on the side of either prosecutors or defendants. It has no more right to become allied with a public defender's office than with prosecutors or police. Probation represents no special interest in society and government but one: the courts.
Police and police organizations have but one interest and one role: law enforcement. Everything they do serves that interest: investigating crime, apprehending criminals, aiding in the prosecution and conviction of the accused, and in the imposition of punishment. The police stand firmly and properly on one side of the scales of criminal justice  the prosecution's side.
Put simply, the functions of police and probation  one serving the prosecution the other serving the courts  are not only different, but incompatible. Separation of the two is essential to the impartiality of the probation function and to the integrity of the judiciary.
The Court has therefore decided to maintain its policy of prohibiting probation officers from becoming members of law enforcement organizations, in particular the FOP [Fraternal Order of Police] and the PBA. A directive to that effect will be issued, including a requirement that existing memberships in the FOP may not be renewed and in any event must be terminated by resignation or otherwise by January 1, 1995. We also prohibit affiliation of PANJ with the PBA.
AOC Directive # 6-97 further stated:
On December 7, 1994, the Administrative Director issued Directive # 9-94 prohibiting new membership in the FOP/PBA by probation officers, and requiring resignation by existing members. Enforcement of Directive # 9-94 was suspended pending resolution of federal litigation. The United States Supreme Court recently declined to grant the Probation Association of New Jersey's petition for certiorari regarding our Supreme Court's decision to uphold the ban on FOP/PBA membership. Accordingly, the Court's 1994 Administrative ruling should now be enforced. *1040 That is, probation officers may not join the FOP or PBA. Existing membership may not be renewed and must be terminated by June 30, 1997.
On March 24, 2003, PANJ moved to dismiss plaintiff's second amended complaint or, alternatively, to transfer the matter to an independent neutral third party for adjudication of all claims, affirmative defenses and counterclaims. George P. Christie, President of PANJ, submitted a certification in support of the motion in which he concluded that "a hearing in this matter should be conducted by an independent third party neutral and not before the Judiciary and its representatives who have already made a final decision as to the result." Christie further stated that because safety is of utmost importance to probation officers, not only did PANJ or its predecessors lobby for passage of the Act for eight years, it negotiated collective bargaining agreements with the AOC containing provisions regarding the safety of probation officers. He added that the Act was passed "over the opposition of the Judiciary both in person and in writing through its staff lobbyist, David Anderson, a former trial court administrator, and upon information and belief through other higher representatives of the Supreme Court."
Christie noted that a directive issued from a meeting of Assignment Judges "or related meetings instructing administrators in the vicinages that the law [Act] is not `self-executing' ... the Judiciary from top to bottom opposes this law" and that a direct connection exists between plaintiff and the New Jersey Supreme Court. He further stated that probation officers face "threatening situations and are in harm's way" on a regular basis, and have been physically confronted and have overseen probationers who committed serious crimes, including murder, while on probation. Christie also noted that based upon the employer-employee relationship between them, the Judiciary and PANJ, "are constantly adversaries in court proceedings and proceedings before administrative agencies" and "are adversaries in scores of grievance matters," and that "PANJ has filed numerous Unfair Practice Charges against the Judiciary pursuant to the Public Employment Relations Act."
Counsel for PANJ also filed a certification in support of PANJ's motion. Among other things, he urged that the Judiciary is "the party which refuses to enforce the legislation in question to which it is opposed and which PANJ lobbied to enact" and that the State Judicial Unification Act made the Judiciary the employer of probation officers and "all contracts and communications with PANJ are with the New Jersey State Judiciary." Attached to counsel's certification was a letter from counsel to plaintiff regarding a disciplinary matter in the Mercer Vicinage in which the local President of PANJ was the subject of the discipline and that Judge Feinberg, the judge assigned to the within matter, had been named as a distributee of the letter. Counsel noted that "on January 21, 2003, Judge Feinberg issued a decision denying PANJ's request to be named a defendant in this matter."
On March 25, 2003, PANJ moved to compel arbitration and sought a stay of the within action while arbitration was pending. Christie also submitted his certification in support of that application, in which he concluded that the Judiciary's refusal to implement the Act "is a violation of the Health and Safety Articles [of various collective bargaining agreements between PANJ and the Judiciary] and must be referred to arbitration for resolution."
In support of that contention, Christie referred to language contained in a series of collective bargaining agreements between *1041 PANJ and the Judiciary concerning the health and safety of probation officers. In particular, he cited to Article 26.1 of the 2001-2004 collective bargaining agreement for the PANJ Case-Related Professionals Unit that provided:
(a) The Judiciary shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment. The Judiciary will discharge its responsibility for the development and enforcement of occupational safety and health standards to provide a safe and healthful environment in accordance with PEOSHA and any other applicable statutes, regulations or guidelines outlined in the New Jersey Register which pertains to health and safety matters. The Judiciary will provide a reasonably safe and healthful place of employment for all employees.
(b) The parties agree to cooperate in maintaining and improving safe working conditions and health protection for the employees with established safety standards and in the promotion of safety, safe working habits and good housekeeping throughout the work environment. Where reasonably possible, each employee will comply with all safety rules and regulations.
Article 26.1 of the 2002-2004 collective bargaining agreement for the PANJ, Professional Supervisors Union contained substantially similar language except the following sentence was added at the end of sub-article (a): "References to safety are intended to include a concept of reasonable personal security and protections which shall be maintained to assure employees against physical harm." Sub-article (b) of the Supervisors' Union Agreement provided that "[w]here applicable, the Judiciary shall be guided by the `Best Practices for Safety Standards for New Jersey Probation.'" Sub-article (c) of the Supervisors' Contract contained the same language as sub-article (b) of the Case-Related Professionals' Agreement.
Christie further stated that the arbitration procedures contained in Article 10 of both agreements provided that the "Judiciary and PANJ agreed to submit contractual issues to binding arbitration[,]" "[p]laintiff's effort to bypass the collectively agreed to arbitration process by filing a declaratory judgment action in the New Jersey Superior Court violated the agreements negotiated by PANJ and the Judiciary[,]" and that "any resolution of whether ... [the Act] must be implemented is an issue for one of the five arbitrators designated by PANJ and the Judiciary: Barry Weinberg, a retired judge, James Mastriani, former Public Employment Relations Commission Commissioner, Robert Glasson, Jeffrey B. Tener and Joan Parker."
Finally, Christie stated that PANJ had pending grievances filed against the Judiciary predicated upon the Judiciary's failure to address certain safety concerns of probation officers, and that the Judiciary had agreed that the resolution of these issues was subject to arbitration.
Judge Feinberg held a conference call with counsel for plaintiff and for PANJ on April 14, 2003. The judge referred to the motion for summary judgment filed by plaintiff and the motions to compel arbitration and appoint a third party neutral filed by PANJ. Noting that plaintiff's motion concerned a constitutional issue, the judge stayed discovery "without prejudice." An order memorializing that determination was entered on April 14, 2003.
On April 29, 2003, PANJ cross-moved for summary judgment. Christie submitted a certification in support of that cross-motion, and in opposition to plaintiff's motion for summary judgment. After repeating the same information contained in his *1042 certification submitted in support of the motion to compel arbitration, Christie detailed some twenty-nine instances between May 10, 2001, and April 2003 where probation officers had faced "dangerous situations ... in the course of performing their regular job duties."
Christie also stated that probation officers are given a "very superficial" basic training course and, although they are instructed to abandon a field visit if it appears dangerous, they risk discipline if they do not make these visits. He added that probation officers do not receive self-defense training or have protective equipment and, although they are instructed to seek police assistance if they need help, police are often not readily available.
Christie further certified that probation officers supervise over 100,000 adult criminal offenders and an additional 15,000 juveniles resulting in a caseload of 170 cases per officer. According to Christie, many of the offenders are dangerous, and there are at least 25,000 outstanding bench warrants for probationers who did not report or comply with conditions of their probation.
Christie also stated that New Jersey federal probation officers, New Jersey state parole officers and probation officers in other states are permitted to carry firearms. He further noted that it was his "understanding that Judge Feinberg and/or her husband and other New Jersey court judges are authorized to carry firearms."
Christie repeated information contained in his certification submitted in support of the motion for the matter to be heard by an independent third party neutral, and urged that the Judiciary possessed a "biased interest" in the outcome of this case and that "[t]he appearance of impropriety throughout the Judiciary is apparent based on the existing employer-employee relationship."
On April 29, 2003, plaintiff cross-moved for summary judgment, seeking dismissal of PANJ's counterclaim with prejudice. The State also cross-moved for summary judgment.
On June 13, 2003, oral argument was held before Hon. Paulette M. Sapp-Peterson on PANJ's motions for reference of the matter to an independent third party; to compel arbitration; and on the motions and cross-motions for summary judgment on the constitutional issue.
Judge Sapp-Peterson denied PANJ's motions for reference and to compel arbitration in an oral opinion, defining the issue as follows:
The basis of this particular application is that the defendants [intervenors] maintain that final arbiters of disputes between the Judiciary and PANJ are third parties, often an arbitrator, a special master or the Public Employees Relation [sic] Commission, otherwise known as PERC. The defendant interveners [sic] argue that no other party to this litigation has had the extensive litigation history with the Judiciary that PANJ has experienced and therefore, it seeks the assistance of administrative agencies or persons who are independent of the Judiciary to resolve this dispute.
The defendants contend that this is necessary because of the adversary relationship between PANJ and the Judiciary and that often includes confrontations with the assignment judges in each vicinage.
In denying the motion to dismiss or alternatively transfer the matter to a third party neutral, and in noting that due process rights had not been implicated, the judge stated:

*1043 The Doctrine of Necessity is applicable to the present case. This Court is mindful that this case has been remanded to Superior Court from the New Jersey Federal District Court and on the basis that there was no ... Federal jurisdictional question implicated ...
Clearly, there is a public need to have this matter decided immediately. Moreover, based on the fact that this matter has been remanded to Superior Court from the Federal Court, it is clear that there is no other alternative forum and the Judiciary as a whole is implicated, thus, the parties can not act without the Judiciary's involvement.
Further addressing PANJ's motion to compel arbitration, the judge stated:
[T]he interveners rely upon Article 26 of the Collective Bargaining Agreement of 2001-2004 and Article 10 of the ... Agreement, which indicates an intent on the part of the Judiciary to submit any statutory claims including any claims as it relates to ... [the Act], to arbitration.
The Court rejects that particular contention and finds that the scope of ... arbitration deal[s] with ... grievances ... disputes arising under the agreement. In reading the agreement, the clear and unambiguous language of this agreement does not call for the arbitrator to interpret legal questions, that is, to determine the constitutionality of this particular statute.
The judge reserved decision on the motions and cross-motions for summary judgment with respect to the constitutionality of the Act.
On December 19, 2003, Judge Sapp-Peterson issued a comprehensive written opinion granting summary judgment to plaintiff and declaring the Act unconstitutional. After reviewing the provisions of the Act, the judge noted that it required the Administrative Director of the Courts to report to the presiding officers of the Senate and General Assembly the effectiveness of the new probation officer unit within eighteen months of the Act's effective date.
The judge also found that plaintiff's constitutional challenge could be addressed without resolution of any factual issues raised in opposition as a basis for denying summary judgment, and that it was not necessary to await completion of discovery prior to addressing the legal issues.
After reviewing the history of probation in New Jersey, the judge noted that the separation of powers among the three branches of government "has never meant an absolute and perpetual division" and does not "prevent cooperative action among the three branches."
Setting forth constitutional and case-law authority for the proposition that the Supreme Court is vested with the broadest possible administrative authority, the judge stated that "[c]onsistent with this constitutional grant of broad administrative powers, the Supreme Court issued Directive # 10-73, prohibiting probation officers from carrying firearms," and the court further found that the Act "is in direct conflict with" that Directive. The judge added that "[a]n administrative directive prohibiting probation officers from carrying weapons in the performance of their duties involves the internal administration of the courts."
The judge discounted the fact that the Judiciary had never challenged previously-existing statutes "that outlined the structure of the probation department and procedures to be followed by probation," as "not dispositive."
The judge further stated that "the focus is not upon whether the legislation interferes with the Judiciary, as it is clear that the Court tolerates actions of other *1044 branches of government affecting the judicial system," but "what is dispositive, is whether the legislative enactment interferes with the Judiciary's mandate to administer the courts."
The judge found such interference improper because
by directing that the Judiciary deploy a certain number of probation officers to the newly created unit, the Legislature is exercising administrative prerogatives over the organization, management and allocation of judicial resources.
* * * *
[I]n addition to being subject to supervision by the Supreme Court, these officers would be subject to supervision by the Attorney General, the chief law enforcement officer of this state....
* * * *
[T]he Act requires the Administrative Director of the Courts to report to the Legislature, within eighteen months of the Act's effective date, on the effectiveness of the unit, despite the Constitution's explicit provision making the Administrative Director subject to the exclusive supervision by the Chief Justice of the Supreme Court.
In summary, the judge concluded that
while the Act represents a legitimate exercise of the Legislature's police power to address a threat to public safety, its implementation impermissibly intrudes and threatens the Judiciary's constitutional authority over the administration of the courts. The specific provisions join together the Legislative, Executive, and Judicial branches of government in a manner inconsistent with the Judiciary's role as an "independent branch of government constitutionally entrusted with the fair and just resolution of disputes"... [and] the specific provisions of the legislation are not susceptible to further harmonization because under the Act, probation officers are both law enforcement and judicial enforcement officers, serving both the Executive and Judicial Branches, a hybrid role that compromises the integrity of the Judiciary.
On January 20, 2004, an order constituting a final judgment was entered that: (1) granted plaintiff's motion for summary judgment and declared the Act unconstitutional and void; (2) denied PANJ's motions to dismiss or alternatively to transfer to an independent neutral third-party and to compel arbitration; (3) granted plaintiff's cross-motion for summary judgment dismissing PANJ's counterclaim with prejudice; (4) denied the State's cross-motion for summary judgment seeking a declaration that the Act was constitutional, and (5) denied PANJ's cross-motion for summary judgment.
On appeal, the State presents the following arguments for our consideration:
POINT I
THE TRIAL COURT ERRED IN FINDING P.L.2001, CHAPTER 362 UNCONSTITUTIONAL.
POINT II
THE ENACTMENT OF P.L.2001, CHAPTER 362 IS A VALID EXERCISE OF THE LEGISLATURE'S CONSTITUTIONAL GRANT OF POWER, JUST AS THE ENACTMENT OF N.J.S.A. 2A:168-5, ET SEQ., ESTABLISHING THE PROBATION DEPARTMENT, WAS A VALID EXERCISE OF THE LEGISLATURE'S CONSTITUTIONAL GRANT OF POWER.
POINT III
P.L.2001, CHAPTER 362 IS SUBSTANTIVE LAW, VALIDLY ENACTED PURSUANT TO THE LEGISLATURE'S *1045 CONSTITUTIONALLY GRANTED POLICE POWER.
POINT IV
THE DOCTRINE OF SEPARATION OF POWERS DOES NOT REQUIRE THE "WATERTIGHT" COMPARTMENTALIZATION OF THE THREE BRANCHES OF GOVERNMENT.
A. The Fact That Designated Probation Officers Are Authorized To Carry Firearms Does Not Impermissibly Transform Them Into Police Officers, Nor Does It Transfer The Responsibility For Their Supervision To The Executive Branch.
POINT V
THE JUDICIARY MUST MAKE EVERY EFFORT TO ACCOMMODATE THE LEGISLATURE IN ITS ENACTMENT OF P.L.2001, CHAPTER 362, IN THE INTEREST OF COMITY.
POINT VI
THE COURT MUST ATTEMPT TO HARMONIZE THE JUDICIARY'S CONSTITUTIONAL GRANT OF RULE MAKING POWER WITH THAT OF THE LEGISLATURE'S GRANT OF POLICE POWER.
PANJ advances the following arguments:
POINT I
THE STANDARD OF APPELLATE REVIEW.
POINT II
THE TRIAL COURT'S HEAVY RELIANCE ON PASSAIC COUNTY, 73 N.J. 247, 374 A.2d 449 (1977) TO DENY THE NEED FOR COMITY IS VITIATED BY THE PASSAGE OF THE JUDICIAL UNIFICATION ACT, N.J.S.A. 2B:11-1 et seq. AND SERVES TO SUPPORT PANJ'S MOTION TO COMPEL ARBITRATION.
POINT III
P.L.2001, CHAPTER 362 DOES NOT INTERFERE WITH THE SUPREME COURT'S JUDICIAL DISCRETION.
POINT IV
ARBITRATION IS FAVORED BY THE COURT AND PANJ'S COLLECTIVE BARGAINING AGREEMENT REQUIRES THAT THE JUDICIARY ARBITRATE BREACHES OF ARTICLES 26, HEALTH AND SAFETY, OF THE COLLECTIVE BARGAINING AGREEMENTS.
A. Plaintiff Did Not Need To Request Arbitration Of This Matter.
POINT V
N.J.S.A. 2A:24-4 MANDATES THAT THE PLAINTIFF'S SUPERIOR COURT ACTION BE STAYED WHILE THE MATTER IS REFERRED TO ARBITRATION.
POINT VI
THE LEGISLATION-N.J.S.A. 2B:10A-1 ET SEQ., IS FOR PROBATION OFFICERS.
A. Probation Officers' Safety Is At Risk Every Work Day.
B. Probation Officers Already Perform Law Enforcement Functions.
POINT VII
NEW JERSEY PROBATION OFFICERS' RESPONSIBILITIES MIRROR PROBATION OFFICERS' RESPONSIBILITIES THROUGHOUT THE UNITED STATES THEREBY EXPOSING THE FOLLY OF THE TRIAL COURT'S ANALYSIS THAT IF NEW JERSEY PROBATION OFFICERS WERE ASSIGNED TO THE EXECUTIVE BRANCH THIS ACT WOULD BE DEEMED CONSTITUTIONAL.
A. Probation Officers Possessed Law Enforcement Officer Responsibilities Prior To P.L.2001, Chapter 362.
POINT VIII

*1046 SUMMARY JUDGMENT IN FAVOR OF PANJ IS APPROPRIATE BECAUSE NEW JERSEY JUDGES ARE OVERSEEN BY THE CHIEF JUSTICE OF THE SUPREME COURT AND ARE SUBJECT TO TRANSFER, PROMOTION AND/OR DEMOTION BY THE CHIEF JUSTICE AFFECTING THE ALLEGED IMPARTIALITY OF NEW JERSEY JUDGES TO HEAR AND DETERMINE THE CONSTITUTIONALITY AND ENFORCEABILITY OF P.L.2001, CHAPTER 362.
POINT IX
PANJ IS RIGHTFULLY ENTITLED TO APPEAL THE FEBRUARY 4, 2003 ORDER DENYING PANJ'S PARTY DEFENDANT STATUS AND THE JANUARY 20 AND 24, 2004 ORDERS FOR SUMMARY JUDGMENT AND DENIAL OF PANJ'S (1) MOTION TO COMPEL ARBITRATION AND STAY THE PROCEEDINGS; AND (2) MOTION TO DISMISS OR ALTERNATIVELY TO TRANSFER TO A THIRD-PARTY NEUTRAL INDEPENDENT BECAUSE: (A) INTERVENORS HAVE A RIGHT TO APPEAL; (B) JUDGE FEINBERG ENDOWED PANJ WITH ALL THE RIGHTS OF A PARTY DEFENDANT; AND/OR, (C) PANJ JOINED IN THE DEFENDANT STATE OF NEW JERSEY'S NOTICE OF APPEAL.
A. There Is No Prohibition Against Intervenors Appealing Judgments.
B. Judge Feinberg Acknowledged That PANJ Would Have All The Rights Of A Party Defendant, Including The Right Of Appeal.
C. PANJ Joined The State Of New Jersey's February 24, 2004 Notice Of Appeal.
POINT X
PANJ IS AN INTERESTED PERSON AND IS AFFECTED BY THE OUTCOME OF PLAINTIFF'S DECLARATORY JUDGMENT ACTION REQUIRING THAT PANJ SHOULD HAVE BEEN NAMED A DEFENDANT IN ACCORDANCE WITH THE UNIFORM DECLARATORY JUDGMENTS ACT, N.J.S.A. 2A:1-50 ET SEQ.
POINT XI
THE JANUARY 20, 2004 ORDER DISMISSING PANJ'S COUNTERCLAIM IS WITHOUT A RECORD.
POINT XII
SUMMARY JUDGMENT WAS PREMATURE BECAUSE PANJ WAS DENIED AN OPPORTUNITY TO CONDUCT DISCOVERY.

I.
The State and PANJ argue that the court erred in granting summary judgment to plaintiff by declaring the Act unconstitutional and in denying their cross-motion for summary judgment. They contend that the Act does not involve the constitutionally unfettered power of the Judiciary to administer the courts, but relates, instead, to the practice and procedure of the courts which is "subject to law," including the Act.
The Act, L. 2001, c. 362, was codified in N.J.S.A. 2B:10A-1 to -3, as follows:

2B:10A-1. Legislative findings
The Legislature finds and declares that:
a. The enforcement of probation sentences is crucial to the public safety;
b. Despite a drop in the overall crime rate, the number of dangerous and repeat offenders who are serving probation sentences has continued to rise in New Jersey;
c. The number of probationers who have violated the conditions of probation *1047 and have a warrant issued for their arrest has reached 15,000;
d. Probation officers working in the New Jersey state courts are not currently permitted to enforce these warrants;
e. Probation officers in other states are permitted to act as law enforcement officers.

2B:10A-2. Probation Officer Community Safety Unit
a. There shall be established within the Administrative Office of the Courts a "Probation Officer Community Safety Unit." The "Probation Officer Community Safety Unit" shall consist of no less than 200 probation officers, duly appointed pursuant to the provisions of N.J.S. 2A:168-5, who shall be authorized to carry a firearm provided the carrying is in accordance with the authority provided in paragraph (17) of subsection c. of N.J.S. 2C:39-6 and such rules as are adopted by the Supreme Court regarding the carrying of a firearm by a probation officer. The probation officer shall undergo a course of law enforcement training as administered by the Police Training Commission which training shall be subject to and in accordance with rules adopted by the Supreme Court. A probation officer in the "Probation Officer Community Safety Unit" shall have the authority to arrest, detain and transport probationers and enforce the criminal laws of this State in accordance with such conditions and guidelines as set forth in rules adopted by the Supreme Court and shall be empowered to enforce warrants for the apprehension and arrest of probationers who violate the conditions of their probation sentence.
b. A "Probation Officer Community Safety Unit" shall be assigned to every county and consist of no less than 5 probation officers.
c. Prior to being permitted to carry a firearm, a probation officer assigned to the "Probation Officer Community Safety Unit" shall take and successfully complete a firearms training course administered by the Police Training Commission, pursuant to P.L.1961, c. 56 (C.52:17B-66 et seq.), and shall annually qualify in the use of a revolver or similar weapon prior to being permitted to carry a firearm.

2B:10A-3. Self-defense training
Any probation officer, duly appointed pursuant to the provisions of N.J.S. 2A:168-5, including probation officers assigned to the "Probation Officer Community Safety Unit" established pursuant to section 2 of P.L.2001, c. 362 (C.2B:10A-2), shall undergo a basic course of self-defense training administered by the Police Training Commission which training shall be subject to and in accordance with rules adopted by the Supreme Court.
Section 5 of the Act provides:
The Administrative Director of the Courts shall report within 18 months of this act's effective date to the presiding officers of the Senate and General Assembly regarding the effectiveness of the "Probation Officer Community Safety Unit" established pursuant to section 2 of P.L.2001, c. 362 (C:2B:10A-2) in tracking and apprehending probationers.
The constitutionality of a statute is presumed and the burden upon a challenger of a statute on constitutional grounds is indeed onerous. As the Supreme Court stated in State v. Trump Hotels and Casino Resorts, Inc., 160 N.J. 505, 526, 734 A.2d 1160 (1999):
Our courts have demonstrated a steadfast adherence to the principle "that every possible presumption favors the validity *1048 of an act of the Legislature." New Jersey Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8, 292 A.2d 545 (1972). Accordingly, the exercise of the judicial power to invalidate a legislative act "has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives." Ibid. Consistent with that policy of restraint, we have emphasized that "a legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt." Harvey v. Essex County Bd. of Freeholders, 30 N.J. 381, 388, 153 A.2d 10 (1959); Gangemi v. Berry, 25 N.J. 1, 10, 134 A.2d 1 (1957).

N.J. Const., Art. VI, § 2, ¶ 3 provides:
The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.
And, N.J. Const., Art. VI, § 7, ¶ 1 provides:
The Chief Justice of the Supreme Court shall be the administrative head of all the courts in the State. He shall appoint an Administrative Director to serve at his pleasure.
In Passaic County Probation Officers' Ass'n v. County of Passaic, 73 N.J. 247, 254, 374 A.2d 449 (1977), the Court considered whether legislative enactments could constitutionally supersede court directives pertaining to probation officers. At issue was a directive from the Chief Probation Officer that had extended working hours for probation officers in Passaic County for thirty minutes per day. Id. at 249, 374 A.2d 449. The plaintiff, an organization of probation officers in Passaic County, sought to enjoin that directive on the ground it was in violation of N.J.S.A. 34:13A-5.3, a section of the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 to -39. Id. at 250, 374 A.2d 449. In discussing the constitutional issues presented, the Court noted that
[t]he intent of the 1947 Constitutional Convention was to vest the Supreme Court with the broadest possible administrative authority. Conceptually, such authority encompasses all facets of the internal management of our courts ... This was made clear by the Committee on the Judiciary which considered it a fundamental requirement that the courts be vested with `exclusive authority over administration.' 2 Proceedings of the Constitutional Convention of 1947, at 1180.... [Lichter v. County of Monmouth, 114 N.J.Super. 343, 349, 276 A.2d 382 (App.Div.1971)].
Chief Justice Weintraub shared precisely the same view. He said that N.J. Const., Art. 6, ¶ 2, ¶ 3 conferred upon this Court "plenary responsibility for the administration of all courts in the State." State v. DeStasio, 49 N.J. 247, 253, 229 A.2d 636 (1967), and that "this Court is charged with responsibility for the overall performance of the judicial branch. Responsibility for a result implies power reasonably necessary to achieve it." In re Mattera, 34 N.J. 259, 272, 168 A.2d 38 (1961).
Chief Justice Vanderbilt had very forcefully expressed the same conviction.
There can be no doubt in the mind of anyone familiar with the work of the Constitutional Convention or with the ensuing election at which the Constitution was adopted by the people that, along with the desire to strengthen the powers of the Governor and to *1049 amplify the powers of the Legislature, there was a clear intent to establish a simple but fully integrated system of courts and to give to the judiciary the power and thus to impose on them the responsibility for seeing that the judicial system functioned effectively in the public interest. Indeed, in the minds of many, if not a majority, of our citizens this was the primary reason for their desire for a new constitution. [Winberry v. Salisbury, 5 N.J. 240, 244, 74 A.2d 406; cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L. Ed. 638 (1950)]
[Id. at 251-52, 374 A.2d 449 (Footnote omitted).]
The Supreme Court then unequivocally held:
The meaning of [the above quoted] constitutional provisions..., as they have been consistently read and interpreted, is so clear and their purpose so manifest as to leave not the slightest doubt that this Court possesses plenary authority with respect to all matters touching the administration of the court system in New Jersey.
[Id. at 252, 374 A.2d 449.]
The Court posited the issue as to "whether probation officers are so integral a part of our court system as to bring them within the scope of ... [the plenary] power." Id. at 253, 374 A.2d 449. In responding affirmatively, the Court stated:
We believe the trial court correctly suggested the answer when it said:
Probation officers function as an enforcement arm of the judicial system. Godfrey v. McGann, 37 N.J. 28, 179 A.2d 6 (1962). In criminal matters they conduct investigations and submit presentence reports and recommendations, supervise probationary sentences and collect fines; on the civil side they likewise conduct investigations and submit reports in a variety of matters at the direction of the judges, collect and enforce support orders and supervise judgments entered by the courts. N.J.S.A. 2A:168-11, 13. In sum, they perform services for the judiciary essential to the fair and efficient administration of justice. [132 N.J.Super. (247) at 250-251 (333 A.2d 300)]
The probation office in each county has been aptly described as "an arm of the state judicial system." Essex County Welfare Board v. Perkins, 133 N.J.Super. 189, 196, 336 A.2d 16 (App.Div.1975). See also, In re: Salaries for Probation Officers of Bergen County, [58 N.J. 422, 278 A.2d 417 (1971)] supra; R. 1:34-4.
It accordingly seems clear that probation officers play an important and indeed vital role in the administration of justice, both in the criminal and civil courts, throughout the State. It follows that as an integral part of the court system, they necessarily come within the regulatory control and superintendence of this Court.
[Ibid.]
In view of the foregoing analysis, the Court then posed the critical question whether probation officers, who are "subject to judicial supervision resting upon a constitutional mandate," are also subject to the Employer-Employee Relations Act. Id. at 254, 374 A.2d 449. The Court resoundingly answered in the negative, as follows:
Stated more generally, can the control of probation officers and of the whole statewide system of probation, seemingly entrusted to the Judiciary by the terms of the Constitution, be in any way diluted or modified by legislation? Subject to what is set forth below, we think it clear that it cannot. As Chief Justice *1050 Vanderbilt observed in Winberry v. Salisbury, supra,

Complete power and responsibility in the judiciary are concepts quite inconsistent with the notions of overriding legislation. [5 N.J. at 249, 74 A.2d 406]
The authority conferred upon this Court by N.J. Const., Art. 6, § 2, ¶ 3, to make rules governing the administration of the judicial system, was not to be found in our earlier Constitutions of 1776 and 1844. It first appeared in the Judicial Article of the Constitution of 1947 and became effective September 15, 1948. N.J. Const., Art. 11, § 4, ¶ 14. At that time there were, of course, on the statute books multiple and farflung legislative arrangements that, in one way or another, were concerned with the administration of the courts of the State and with those public employees who were part of the court system. Examples, as to the latter, might include statutes concerning pension rights, those concerning workmen's compensation benefits or those having to do with civil service. Each of these bodies of legislation  and others as well  affects public employees, including those engaged in aspects of judicial administration. Since September, 1948 much other legislation, of the kind described above, has been adopted, including the New Jersey Employer-Employee Relations Act, which the plaintiff here invokes. The question then arises as to whether these statutory arrangements have precedence over rules of this Court promulgated pursuant to its obligation to insure a proper administration of the court system.
The conclusion is quite inescapable that the constitutional mandate given this Court to "make rules governing the administration of all courts in the State" transcends the power of the Legislature to enact statutes governing those public employees properly considered an integral part of the court system.
[Id. at 254-55, 374 A.2d 449.]
R. 1:34-4, entitled "Probation Officers and Volunteers in Probation," which is included in "Chapter IV. Administration," provides:
Probation officers and volunteers in probation shall be appointed in accordance with standards fixed by the Supreme Court. All probation officers and volunteers in probation shall be responsible to and under the supervision of the Chief Probation Officer of the county who shall be responsible to and under the supervision of the judge designated by the Assignment Judge to be responsible for the administration of the probation department in the county in accordance with applicable statutes, rules of the Supreme Court, and directives of the Chief Justice, the Administrative Director of the Courts and the Assignment Judge of the County.
Passaic County was specifically followed in Ocean Council No. 12 v. County of Ocean, 167 N.J.Super. 73, 75, 400 A.2d 521 (App.Div.1979), where we recognized "the paramount authority of the Supreme Court and of the respective assignment judges to determine and to fix the hours of employment, vacations and vacation days" and compensation of court clerks.
Our decisions in In re City of Newark, 346 N.J.Super. 460, 472, 788 A.2d 776 (App.Div.2002), and In re Court Reorganization Plan of Hudson County, 161 N.J.Super. 483, 490, 391 A.2d 1255 (App.Div.1978), aff'd o.b., 78 N.J. 498, 396 A.2d 1144 (1979), have reinforced the concept that the Constitution vests the Supreme Court with the broadest possible administrative authority over the internal management of the court system. As we noted in Lichter v. Monmouth County, 114 *1051 N.J.Super. 343, 348-49, 276 A.2d 382 (App.Div.1971):
The jurisdiction of the Chief Justice and the Supreme Court over court reporters is not dependent upon the court's power to supervise practice and procedure "subject to law" but, rather, the power to make rules governing the administration of the courts. N.J. Const., Art. VI, § II, ¶ 3. Within the meaning and concept of that constitutional provision, whether court proceedings should be recorded and, if so, by what means, is a matter within the ambit of the administration of the courts. The constitutional administrative power is absolute and unqualified, and our Supreme Court has characterized it as the "plenary responsibility for the administration of all courts in the State."
[Citations omitted.]
With regard to the binding effect of administrative directives, Judge Stern stated in State v. Linares, 192 N.J.Super. 391, 397, 470 A.2d 39 (Law Div.1983), that in addition to the Supreme Court's constitutional authority to "promulgate rules of administration as well as practice and procedure,... the Chief Justice, as administrative head of the court system, can promulgate binding directives either directly or through the Administrative Director of the Courts."
In view of the Court's holding in Passaic County, it is clear that probation officers, as employees of the Judiciary, are unquestionably subject to the Court's administrative directives promulgated in accordance with its plenary constitutional authority.
Contrary to the State's assertion, the Supreme Court's authority to promulgate rules of practice and procedure is not implicated in this case because the directive prohibiting probation officers from carrying weapons and the Judiciary's policy that probation officers are not law enforcement personnel, clearly fall within the sphere of administration and internal management. The court in Suchit v. Baxt, 176 N.J.Super. 407, 427, 423 A.2d 670 (Law Div.1980), characterized a "procedural rule" as "one step in the ladder to final determination and [which] can effectively aid a court function." Rules falling into the category of practice and procedure include a court rule that limited the time to appeal from a final judgment to forty-five days, Winberry, supra, 5 N.J. at 248, 74 A.2d 406; a long-arm rule, Sears Roebuck & Co. v. Katzmann, 137 N.J.Super. 106, 109, 348 A.2d 193 (App.Div.1975), and a rule governing the reopening of a judgment, Borough of New Shrewsbury v. Block 115, Lot 4, 74 N.J.Super. 1, 8, 180 A.2d 387 (App.Div.1962).
In Winberry, supra, the Court considered whether the court rule that limited the time to appeal prevailed over a statute "which permitted an appeal within one year after judgment rendered." 5 N.J. at 243, 74 A.2d 406. In resolving this conflict in favor of the rule, the Court was called upon to interpret the phrase "subject to law" within the meaning of Article VI, § 2, ¶ 3 of the Constitution of 1947. Ibid.
The Court held that based upon its analysis of the pertinent provisions of the 1947 Constitution, "the phrase `subject to law' cannot be taken to mean subject to legislation." Id. at 245, 74 A.2d 406. A "dual exercise of rule-making power" would, according to the Court, result in a "chaotic situation." Id. at 245-46, 74 A.2d 406. Rather, the Supreme Court stated:
What, then, is the meaning of "subject to law"? The only interpretation of "subject to law" that will not defeat the objective of the people to establish an integrated judicial system and which will at the same time give rational significance *1052 to the phrase is to construe it as the equivalent of substantive law as distinguished from pleading and practice. The distinction between substantive law, which defines our rights and duties, and the law of pleading and practice, through which such rights and duties are enforced in the courts, is a fundamental one that is part of the daily thinking of judges and lawyers. Substantive law includes much more than legislation, it comprehends also the rights and duties which have come down to us through the common law. The phrase "subject to law" in Article VI, Section II, paragraph 3 of the Constitution thus serves as a continuous reminder that the rule-making power as to practice and procedure must not invade the field of the substantive law as such. While the courts necessarily make new substantive law through the decision of specific cases coming before them, they are not to make substantive law wholesale through the exercise of the rule-making power.
[Id. at 247-48, 74 A.2d 406.]
Through administrative directives, the Supreme Court unambiguously decreed that its employee-probation officers are not to carry firearms, that probation work is not law enforcement, and that probation officers are therefore not permitted to join law enforcement unions such as the PBA and FOP.
Surely, these directives arose out the Court's plenary powers to "make rules governing the administration of all courts in the State," within the meaning of N.J. Const., Art VI, § 2, ¶ 3, since they are concerned with the function and duties of probation officers. Passaic County, supra, 73 N.J. at 253, 374 A.2d 449. The directives do not arise out of the Court's constitutional authority to make rules governing practice and procedure because the directives have nothing to do with steps leading to a final determination of a lawsuit. Any argument that the directives are subject to the Act is unavailing because, as noted, the directives do not relate to practice and procedure, and the phrase "subject to law" which precedes "practice and procedure" in N.J. Const., Art VI, § 2, ¶ 3, does not mean subject to legislation. Winberry, supra, 5 N.J. at 245, 74 A.2d 406.
Defendants rely upon State v. Leonardis, 73 N.J. 360, 375 A.2d 607 (1977), to bolster their position that the directives "fall squarely within the practice and procedure of the [Supreme] Court." In Leonardis, the Court held that "[a]s a procedural alternative to trial, PTI [the pre-trial intervention diversionary program] falls within the practice and procedure over which ... [it] has control through its rule-making powers" and that "PTI ... [is] a remedial aspect of a criminal proceeding." Id. at 368, 370, 375 A.2d 607. Here, however, the directives at issue do not relate to a proceeding pending before a court. Rather, they deal with the Supreme Court's superintendence of the function and duties of a specific class of Judiciary employees.
Defendants nevertheless argue that since the separation of powers doctrine does not require "watertight" compartmentalization of the three branches of government, the Judiciary must make every effort to accommodate the Legislature in its enactment of the Act in the interest of comity and must attempt to harmonize its constitutional grant of rule-making power with the Legislature's grant of police power.
There is no question that the three branches of government do not stand in isolation from each other. Although the Supreme Court has unfettered authority to issue these directives, the crucial question *1053 to be considered is whether the Judiciary should defer to the will of the Legislature in this particular case. N.J. Const., Art. III, § 1 provides:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
In Communications Workers v. Florio, 130 N.J. 439, 617 A.2d 223 (1992), the Supreme Court considered whether the above-noted constitutional provision was violated by provisions of appropriation legislation containing mandatory language directing "that personnel reductions shall be accomplished by layoffs of managerial and other exempt personnel outside... collective bargaining units." Id. at 443, 617 A.2d 223. In discussing the separation of powers provision, the Court stated:
Despite the explicit constitutional mandate that "contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch," Knight v. Margate, 86 N.J. 374, 388, 431 A.2d 833 (1981), we have always recognized that the doctrine requires not an absolute division of power but a cooperative accommodation among the three branches of government. General Assembly v. Byrne, 90 N.J. 376, 382, 448 A.2d 438 (1982); Knight v. Margate, supra, 86 N.J. at 388, 431 A.2d 833; Brown v. Heymann, 62 N.J. 1, 11, 297 A.2d 572 (1972).
In one of the first cases to address the separation-of-powers doctrine under the 1947 Constitution, Chief Justice Vanderbilt recognized that a rigid and inflexible classification of the branches of government into mutually-exclusive, water-tight compartments would "render government unworkable." Massett Bldg. Co. v. Bennett, 4 N.J. 53, 57, 71 A.2d 327 (1950). More recently we expressed the same thought in In re Salaries for Probation Officers, 58 N.J. 422, 425, 278 A.2d 417 (1971): "The compartmentalization of governmental powers among the executive, legislative and judicial branches has never been watertight." We understand that "[i]nevitably some osmosis occurs when the branches touch one another; the powers of one branch sometimes take on the hue and characteristics of the powers of the others." Knight v. Margate, supra, 86 N.J. at 388, 431 A.2d 833. The aim of the separation-of-powers doctrine is not to prevent such cooperative action, but to guarantee a system in which one branch cannot "claim[ ] or receiv[e] an inordinate power." Brown v. Heymann, supra, 62 N.J. at 11, 297 A.2d 572.
[Id. at 449-450, 617 A.2d 223.]
Nevertheless, the Court held that the legislation was unconstitutional because the "Legislature's attempt to `micromanage' the staffing and resource allocations in administering the appropriated funds was a serious intrusion on the Governor's authority and ability to perform his constitutionally-delegated functions." Id. at 461, 467, 617 A.2d 223.
The Court in Passaic County, supra, stated that "since 1948, [it has] been the practice of this Court, with only occasional deviation, to accept and adopt legislative arrangements that have not in any way interfered with this Court's constitutional obligation" and that the Court had "every intention of continuing this practice." 73 N.J. at 255, 374 A.2d 449 (emphasis added). The Court added that:

Only where we are satisfied that the proper exercise of our constitutional responsibility to superintend the administration *1054 of the judicial system requires such action would we feel compelled to exert this power in the adoption of a rule at odds with a legislative enactment. We repeat that in the absence of any action by this Court  felt to be constitutionally compelled  and as a matter of comity and respect for other branches of government, we accept and adopt all statutory arrangements touching or concerning the administration of any courts in the State, as well as such legislative enactments as have to do with public employees whose duties are intimately related to the judicial system.
[Ibid. (Emphasis added).]
The Court added that the plaintiff union should be "accorded forthwith an opportunity to present any grievance or proposal it may wish" to the defendant Passaic County Judges with respect to the challenged directive of the Chief Probation Officer. Id. at 257, 374 A.2d 449.
In CWA Local 1044 v. Chief Justice, 118 N.J. 495, 497, 572 A.2d 613 (1990), the Court considered whether it was compelled by its decision in Passaic County to negotiate agency fees with judicial employee labor unions pursuant to N.J.S.A. 34:13A-5.5(a). The Judiciary had refused to negotiate that issue. Ibid. The trial court upheld that refusal, reasoning that the Supreme Court had "exclusive power over the administration of the court system, including the power to determine its own policies in the judicial labor relations field, despite conflicting legislative provisions." Ibid.
In affirming the judgment of the trial court, the Court unequivocally stated:
Plaintiff would read ... [Passaic County] as somehow creating an inflexible rule of law restricting this Court's constitutional, exclusive power over the administration of the judiciary. It claims that this Court may adopt rules of administration in conflict with a statute only when it is "constitutionally compelled" to do so, thereby implying an extremely narrow scope to our power to govern the courts. We disagree. Very simply, and fairly read, that case sets forth this Court's policy that when a statute has an impact on our administration, we will follow it unless it interferes with the effective functioning of the courts. And so we have done. The occasions when we have concluded that our exclusive responsibility to administer the judicial system calls for a result different from that ordained by the Legislature are few. In this spirit of comity, we will continue to defer to the Legislature. But our obligation to give the people of this state effective administration of justice, squarely imposed on us by the constitutional grant of exclusive responsibility over the administration of the court system, cannot be diluted, as it would be, by plaintiff's restrictive interpretation of [Passaic County]. Rather, in each instance we must examine the terms of the legislative enactment, its importance, the extent of its interference with sound judicial administration, and the significance of the issue to the judiciary, ultimately striking a balance between the interests served by comity and those served by the administration of justice. The reams of statutory material with which we have complied overwhelm the few instances when we have gone our own way.
[Id. at 501, 572 A.2d 613.]
The Court noted, however, that the question of agency fees was under consideration by the Chief Justice "in his constitutional capacity as administrative head of the judicial branch of government." Id. at 498, 572 A.2d 613. The Court added that "[a]dministrative action ... will ordinarily be the means of revising or reversing ... *1055 [its] exercise of ... [its constitutionally mandated exclusive power over the administration of the courts], given the quasi-legislative discretion conferred on the Court when acting in its constitutionally allotted field." Id. at 509, 572 A.2d 613. The Court further stated that it remained open to any application addressed to its "sound discretion to revise or reverse any administrative decision." Id. at 509-510, 572 A.2d 613.
In Knight v. City of Margate, 86 N.J. 374, 431 A.2d 833 (1981), the Court upheld amendments to the New Jersey Conflicts of Interest Law as applied to members of the Judiciary with respect to their dealings with casinos, stating in pertinent part:
[I]n the full enjoyment of its paramount and exclusive powers over the judicial branch, the Supreme Court has the authority, reasonably to be implied under the twin principles of the separation and interdependence of governmental powers, to permit or accommodate the lawful and reasonable exercise of the powers of other branches of government even as that might impinge upon the Court's constitutional concerns in the judicial area. The constitutional validity of such action by another branch of government, and the Supreme Court's ultimate power to accept or reject such action, turn upon the legitimacy of the governmental purpose of that action and the nature and extent of its encroachment upon judicial prerogatives and interests.
* * * *
In many aspects we discern no fundamental schism between the New Jersey Conflicts of Interest Law and judicial interests.
* * * *
We do not believe that the restrictions imposed by the latest amendments, L. 1981, c. 142, will in any way interfere with the sound administration of the judicial system or undermine the proper regulation of the ethical conduct of members of the judiciary and the bar. Any possible doubts on this score dissipate in light of this Court's overriding constitutional authority to adopt and fashion its own regulatory and ethical requirements for the judicial branch and the practicing bar at any time it becomes appropriate to do so regardless of the Legislature's action.
[86 N.J. at 390-91, 392, 394, 431 A.2d 833.]
The Court thereby concluded that the New Jersey Conflicts of Interest Law did not conflict with the constitutional power of the Supreme Court. Id. at 394, 431 A.2d 833.
Here, however, since 1974 the Supreme Court has steadfastly maintained that its probation officer-employees are not to carry firearms and must not serve a law enforcement function. The Court's rationale is grounded upon clearly stated policy that probation must remain a scrupulously impartial arm of the judiciary and must not be allied with prosecutorial or defense elements. The Act directly flies in the face of this policy as embodied in implementing directives. Therefore, we conclude that this is one of those rare instances where the Court could not defer to the enacted legislation through the exercise of comity. Simply put, the Act remains an unconstitutional intrusion into the Supreme Court's administration of New Jersey's Judiciary.
PANJ argues, however, that Passaic County has been vitiated by the passage of the Judicial Employees Unification Act, N.J.S.A. 2B:11-1. Specifically, PANJ maintains that the Unification Act granted probation officers the "unfettered right to *1056 negotiate with the judiciary," and as a first step in the negotiation process, labor and management (the Judiciary) entered into a December 28, 1994, Letter of Agreement which afforded probation worker-employees protection through PERC and which "addressed health and safety as a mandatory subject of bargaining and recognized that disputes between the judiciary and labor unions, will be resolved through the grievance procedure." This contention is without merit.
It is clear that N.J.S.A. 2B:11-4 provided for elections to establish collective bargaining representatives for Judiciary employee units and that these elections were to be conducted by PERC. However, no provision of the Unification Act diluted the controlling holding in Passaic County, supra, that the "constitutional mandate given ... [the Supreme] Court to `make rules governing the administration of all courts in the State' transcends the power of the Legislature to enact statutes governing those public employees properly considered an integral part of the court system." 73 N.J. at 255, 374 A.2d 449.
Although the Judiciary has undoubtedly agreed to participate in employee grievance procedures established by collective negotiations, and while health and safety issues could be addressed through these procedures, such procedures have no relation to a legislative enactment directly interfering with the plenary constitutional prerogatives of the Supreme Court.
PANJ also argues that the trial court's analogy to Communications Workers v. Florio, supra, is legally deficient because, in that case, the Supreme Court held that the Legislature unconstitutionally hampered executive discretion on staffing decisions, but the Act does not hamper the Judiciary's discretion with respect to the staffing of the Unit. Simply stated, however, the Act directly interferes with the Judiciary's constitutional prerogatives in the first instance because it requires the Judiciary to establish the Unit. That the legislation permits the Judiciary to staff the Unit as the Judiciary sees fit is irrelevant.
PANJ further argues that safety issues facing probation officers are well documented; that the Act addresses these problems; that more than three dozen states permit some or all probation officers to be armed and to perform law enforcement functions; and that Passaic County allows probation officers to carry handcuffs and provides them with guidelines with respect to the execution of arrest warrants against probationers who have violated conditions of probation.
Although it cannot be disputed that probation officers face dangerous situations and that the Act has a salutary purpose, as noted above, the Act directly clashes with the plenary constitutional authority of the Supreme Court to make rules concerning the administration of the Judiciary. That other states permit their probation officers to carry weapons and to possess law enforcement authority is totally irrelevant. That Passaic County grants its probation officers "limited" law enforcement authority is also irrelevant and, in any case, possibly improper, since such may be contrary to Supreme Court directives. See N.J. Const., Art. VI, § 2, ¶ 3.
In support of its position that probation officers already possess law enforcement powers, PANJ pointed to the legislative history of R.S. 2A:168-2, the provisions of N.J.S.A. 2A:168-11, and our unpublished opinion in State in the Interest of S.B., No. A-6577-00 (App.Div. July 3, 2002).
The statement in support of R.S. 2A:168-2 provides in pertinent part:
Probation may be said to be a branch of the correctional system of the State. *1057 Through its investigative and supervisional service it protects society from the release of unworthy criminals, aids the court in administering fair and impartial justice, gives deserving lawbreakers or delinquents an opportunity to rehabilitate themselves and take their proper places in the community. Properly administered it is a great taxsaver and conserves the moral and human assets of the State.
This bill will clarify present procedure, set up definite powers and duties for probation officers, make uniform methods of procedure and eventually place the probation service of the State on the same intelligent basis now maintained in our penal, reformative and correctional institutions.
N.J.S.A. 2A:168-4, which was repealed by L. 1978, c. 95, provided in relevant part:
At any time during the probation period the court may issue a warrant and cause the probationer to be arrested for violating any of the conditions of his probation, or any probation officer, police officer, or other officer with power of arrest, upon the request of the chief probation officer, may arrest the probationer without a warrant; ...
N.J.S.A. 2C:45-3, which was derived from N.J.S.A. 2A:168-4, provides, in part:
a. At any time before the discharge of the defendant or the termination of the period of suspension or probation:
* * * *
(2) A probation officer or peace officer, upon request of the chief probation officer or otherwise having probable cause to believe that the defendant has failed to comply with a requirement imposed as condition of the order or that he has committed another offense, may arrest him without a warrant;
N.J.S.A. 2A:168-11 prescribes the powers and duties of probation officers and provides that they "shall have the powers of constables in the execution of their duties."
Although N.J.S.A. 2C:45-3 and N.J.S.A. 2A:168-11 grant probation officers some law enforcement authority, i.e., the power to make arrests, they are silent with regard to the carrying of firearms by these officers. Directive # 10-73 prohibits probation officers from carrying weapons and declares that probation work is not law enforcement. It does not preclude these officers from arresting defalcating probationers, and the Supreme Court apparently has not acted to prevent that.
These statutes, however, do not grant probation officers any additional law enforcement authority not acquiesced in by the Supreme Court. Importantly, they have never been subject to challenge on the grounds that they unconstitutionally interfere with the rule-making powers of the Supreme Court.
To the extent these statutes conflict with subsequent directives of the Supreme Court, both statutes, whose pertinent language is derived, respectively, from sections four and seven of L. 1929, c. 156, must yield to such directives. Thus, in George Siegler Co. v. Norton, 8 N.J. 374, 381-82, 86 A.2d 8 (1952), the Supreme Court considered the effect of court rules upon a previously enacted statute, stating:
Under the settled construction of Article VI, Section II, par. 3 of the Constitution of 1947, the Supreme Court has exclusive and plenary power to promulgate rules governing practice and procedure in our courts, as distinguished from matters involving substantive law. Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406 (1950). It follows, therefore, that where a statute, wholly procedural in its operation, is in conflict, either directly or *1058 by necessary implication, with a rule of procedure promulgated by this court pursuant to the authority delegated to it under the Constitution, the latter must prevail. Such was the effect of our holding in the Winberry case where it was said ... that "One of the objectives of the people in adopting the Constitution was to provide for uniformity as well as simplification and flexibility in the work of the courts. This objective would be frustrated by any * * * dual exercise of rulemaking power."
In our unreported opinion in State in the Interest of S.B., supra, the appellant argued that he should have been acquitted on various charges because he was arrested by probation officers, the charges required that the offenses be committed against a law enforcement officer and that a probation officer is not a law enforcement officer. In affirming, we stated:
It is clear that probation officers have the power to arrest a probationer for violating the terms of probation, with or without a warrant, depending on the circumstances. N.J.S.A. 2C:45-3a(2); N.J.S.A. 2A:168-11. Moreover, a probation officer has the same arrest powers as a constable for offenses committed in his or her presence. State v. Vigliano, 43 N.J. 44, 52, 202 A.2d 657 (1964). The mere fact that probation officers have duties with respect to counseling probationers and rehabilitation does not change the fact that they must also function as law enforcement officers when apprehending probationers who violate the terms of probation.
Our unpublished opinion, having no binding effect, see R. 1:36-3, held that a probation officer functions as a law enforcement officer when apprehending probationers. This ruling, however, does not make probation officers law enforcement officers for all purposes and certainly has no impact upon issues involving the constitutional power of the Supreme Court presented in this case.
The State has also cited to a number of statutes concerning the appointment and qualifications of probation officers, N.J.S.A. 2A:168-5; the powers and duties of the chief probation officer, N.J.S.A. 2A:168-7; salaries and expenses of probation officers, N.J.S.A. 2A:168-8; the appointment and compensation of temporary probation officers, N.J.S.A. 2A:168-9; the oath to be taken by probation officers, N.J.S.A. 2A:168-10; and the powers and duties of probation officers (including the powers of constables in the execution of their duties), N.J.S.A. 2A:168-11. The State argues that the Legislature exercised its prerogative regarding the structure and responsibilities of the Probation Department, that the Supreme Court in Passaic County had relied on provisions of the probation officer statute, and "never took note of any constitutional infirmity." The State questions why the Legislature is empowered to enact N.J.S.A. 2A:168-5, a statute outlining the structure of the Probation Department and the procedures to be followed by probation officers, but not be permitted to pass the Act, which modifies those structures and procedures.
However, the fact that the Legislature has enacted statutes pertaining to probation officers, including their powers and duties, does not automatically invest the Act with constitutional validity. First, in its brief, the State concedes that
[t]he Legislature's authority to create the Probation Department, delineate its structure and set forth the procedures to be followed by probation officers as set forth in N.J.S.A. 2A:168-5 et seq. has never been the subject of constitutional challenge, under either the separation of powers doctrine, or as a violation *1059 of the Judicial Article added to the New Jersey Constitution in 1947.
Moreover, as noted, the Supreme Court has apparently acquiesced in these statutes, including N.J.S.A. 2C:45-3, which was derived from N.J.S.A. 2A:168-4 (granting probation officers authority to arrest a probationer without a warrant), and N.J.S.A. 2A:168-11 (granting probation officers the powers of constables in the exercise of their duties).
Most significantly, the State's contention concerning the scope of the Legislature's authority is belied by the Court's holding in Passaic County, supra, that probation officers "necessarily come within the regulatory control and superintendence" of the Supreme Court, that the "control of probation officers and of the whole statewide system of probation, seemingly entrusted to the Judiciary by the terms of the Constitution," cannot be diluted or modified by legislation, and that the constitutional mandate granted the Supreme Court to "make rules governing the administration of all courts in" New Jersey, "transcends the power of the Legislature to enact statutes governing those public employees properly considered an integral part of the court system." 73 N.J. at 253-55, 374 A.2d 449.
The State also contends that the Act is substantive law, enacted pursuant to the Legislature's constitutionally granted police power, which "supervenes all other law." This contention lacks merit.
The Supreme Court's firearms directive and the directive prohibiting probation officers from joining police unions were issued in accordance with the Court's unfettered constitutional prerogative to "make rules governing the administration of all courts." These directives did not emanate from the Court's authority, "subject to law," to make rules governing practice and procedure. The State's "subject to" argument is therefore unavailing.
As the Court noted in State v. Vawter, 136 N.J. 56, 63, 642 A.2d 349 (1994):
Our cases recognize that "[i]n the exercise of police power, a state may enact a statute to promote public health, safety or the general welfare." The authority of the State to regulate is limited, however; a State may not exercise its police power in a manner "repugnant to the fundamental constitutional rights guaranteed to all citizens."
[Quoting State, Dep't of Envtl. Protection v. Ventron Corp., 94 N.J. 473, 499, 468 A.2d 150 (1983) and Gundaker Cent. Motors v. Gassert, 23 N.J. 71, 79, 127 A.2d 566 (1956), appeal denied, 354 U.S. 933, 77 S.Ct. 1397, 1 L. Ed.2d 1533 (1957).]
Similarly, although the Act may have been passed in accordance with the exercise of the police power to protect probation officers and the citizenry in general, it nevertheless trammels upon the Supreme Court's plenary constitutional authority to make rules concerning the administration of the courts. Stated differently, that the Act may be considered an exercise of police power does not make it constitutional.
Accordingly, we conclude Judge Sapp-Peterson properly ruled that the Act was unconstitutional.

II.
PANJ also contends the trial court erred in denying their request that the matter be submitted to arbitration in accordance with their collective bargaining agreements. PANJ argues that arbitration is favored and that their collective bargaining agreements require that the Judiciary arbitrate breaches of Articles 26 and 26.1, the health and safety provision. PANJ asserts that by filing a declaratory *1060 judgment action, the Judiciary has sought to usurp the arbitration provisions in the 2001-2004 and in the 2000-2004 collective bargaining agreements between the Judiciary and PANJ Case Related Unit and between the Judiciary and PANJ Professional Supervisors Union, respectively. PANJ further asserts that N.J.S.A. 2A:24-4 requires that plaintiff's action be stayed pending arbitration. These contentions are devoid of merit.
As stated in Board of Educ. of Tp. of Neptune v. Neptune Tp. Educ. Ass'n, 144 N.J. 16, 22, 675 A.2d 611 (1996):
[The Employer-Employee Relations Act] created certain substantive rights and limitations, including a rule against the alteration of existing working terms and conditions. N.J.S.A. 34:13A-5.3 provides that "[p]roposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established." Stated negatively, this rule, known as the prescription against unilateral change of the status quo,"prohibit[s] an employer from unilaterally altering the status quo concerning mandatory bargaining topics, whether established by expired contract or by past practice, without first bargaining to impasse."
The overriding issue here  the constitutionality of the Act  is exclusively determinable by courts of competent jurisdiction, and not by an arbitrator. "The function of the courts is to review legislative enactments to determine their constitutionality." State v. New Jersey Trade Waste Ass'n, 191 N.J.Super. 144, 152, 465 A.2d 596 (Law Div.1983). Indeed, "[n]o administrative agency has jurisdiction to declare a statute unconstitutional." Stubaus v. Whitman, 339 N.J.Super. 38, 62, 770 A.2d 1222 (App.Div.2001), certif. denied, 171 N.J. 442, 794 A.2d 181 (2002). As noted in Student Members of the Playcrafters v. Teaneck Tp. Bd. of Educ., 177 N.J.Super. 66, 73, 424 A.2d 1192 (App.Div.), aff'd o.b., 88 N.J. 74, 438 A.2d 543 (1981):
Ordinarily, administrative remedies must be exhausted before resort is had to the courts. However, the exhaustion doctrine is neither jurisdictional nor absolute. One of the exceptions to the doctrine arises when only a question of law need be resolved. Thus, when, as in this matter, the only challenge to the Board's policy is based on constitutional grounds and no factual issues exist which require administrative determination, the doctrine of exhaustion is not applicable, and judicial intervention is justified.
If an administrative agency, which is vested with "specialized expertise," In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 330, 807 A.2d 198 (App.Div.2002), lacks jurisdiction to declare a statute facially unconstitutional, then such proposition applies with greater force to an arbitrator. As stated by the Supreme Court of Connecticut in Caldor, Inc. v. Thornton, 191 Conn. 336, 464 A.2d 785, 791 n. 6 (1983), aff'd, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985) (citations omitted):
Our conclusion that the board [of mediation] does not possess the authority to decide issues of facial unconstitutionality does not conflict with the established principle that arbitrators act in a quasi-judicial capacity and are empowered to decide factual and legal questions unless the submission states otherwise.... Because of the public policy favoring expeditious dispute resolution in the informal context of arbitration rather than in the more formal, time-consuming and expensive context of ordinary litigation, we have always respected the autonomy of *1061 the arbitration process and the attendant authority to decide questions of law and fact consistent with the submission. This autonomy does not, however, extend to determinations of facial constitutionality. A statute which granted the board such power, which lies exclusively under the control of the courts, would be void as a violation of the separation of powers doctrine.
Furthermore, under the applicable collective bargaining agreements, neither the validity of the Act itself, nor the subject matter of the Act  the arming of probation officers and their enhanced law enforcement functions  is subject to arbitration.
Article 10 of the agreement between the Judiciary and the PANJ Professional Unit provides in relevant part:
Section 1. Grievance Definitions and Procedures
1. A grievance is any dispute between the parties concerning the application or interpretation or a claimed breach of the terms of this Agreement (contractual grievance); or
2. A claimed violation, misinterpretation or misapplication of rules and regulations, existing policies, orders, letters or memoranda or agreements, but not the December 28, 1994 Letter of Agreement and the statements in the November 20, 1994 letter from Theodore J. Fetter of the Judiciary to David Fox concerning the establishment and implementation of the title of Master Probation Officer, and other matters, administrative decisions, or laws applicable to the Judiciary, and policies applicable to the grievant dealing with terms and conditions of employment which are not included in (1) above, as well as disputes or complaints concerning policies or administrative decisions (non-contractual grievance).
3. All grievances are subject to this procedure, except that arbitration shall not be available for non-contractual grievances.
The agreement establishes a series of steps to be followed in pursuing a grievance. Step 4, permitting the union to request arbitration if the grievance is not resolved at Step 3, provides in relevant part:
C. The arbitrator shall conduct a hearing to determine the facts and render a decision in writing to the parties. The arbitrator shall not have the power to add to, subtract from, or modify the provisions of this Agreement or laws of the State, or to determine any dispute involving the exercise of legally non-negotiable management function not waived, and shall confine his/her decision solely to the interpretation and application of this Agreement.
The relevant provisions contained in Article 10 of the collective bargaining agreement between the Judiciary and PANJ Supervisors Union are similar.
In addition, managerial prerogative provisions of both collective bargaining agreements entitled "Article 12 Management Rights" provide as follows:
12.1 The Judiciary retains and may exercise all rights, powers, duties, authority and responsibilities conferred upon and vested in it by the Statutes and Constitutions of the State of New Jersey and of the United States of America, applicable court decisions and policies promulgated by the Supreme Court of New Jersey under its rulemaking authority, and directives of the Administrative Office of the Courts.

*1062 12.2 Except as specifically abridged, limited or modified by the terms of this Agreement, all such rights, powers, authority, prerogatives of management and responsibility to promulgate and enforce rules and regulations governing the conduct and the activities of judicial employees are retained by the judiciary.
Grievances pertaining to "laws applicable to the Judiciary" are classified as "non-contractual" and, as such, are not subject to arbitration. Thus, the facial validity of the Act is not subject to arbitration.
Moreover, the arming of probation officers, their law enforcement status and their training clearly fall within the realm of managerial prerogatives. See NJ Transit Auth. v. NJ Transit PBA, Local 304, 314 N.J.Super. 129, 137, 714 A.2d 329 (App.Div.1998) ("a public employer has a prerogative to determine training issues"). See also City of Boston v. Boston Police Patrolmen's Assoc., Inc., 41 Mass.App.Ct. 269, 669 N.E.2d 466, 468, review denied, 423 Mass. 1109, 672 N.E.2d 538 (1996), ("considerations of public safety and a disciplined police force require managerial control over matters such as staffing levels, assignments, uniforms, weapons, definition of duties, and deployment of personnel").
Managerial prerogatives are not subject to arbitration. As the Court stated in Kearny PBA Local No. 21 v. Town of Kearny, 81 N.J. 208, 215, 405 A.2d 393 (1979),
what may be submitted to binding arbitration in the public sector is circumscribed. Unlike the private sector, prerogatives of management, particularly those involving governmental policy making, cannot be bargained away to be determined by an arbitrator. The underlying reason for this position is founded on the concern of delegating such power to a private person.
Based upon the Judiciary's view of the function of probation officers, the Judiciary promulgated "governmental policies" that the officers are not to carry weapons and are not "law enforcement" in the traditional sense. Under applicable case law, these policies are not subject to arbitration.
Furthermore, the respective collective bargaining agreements contain managerial prerogative provisions (Article 12) that, among other things, leave the Judiciary free to "promulgate and enforce rules and regulations governing the conduct and the activities of judicial employees ... except as specifically abridged, limited or modified by the terms of" the agreements.
The agreements are silent with respect to the carrying of firearms by probation officers or their "law enforcement" status. Even assuming that these agreements could, they do not, in fact, specifically limit the Judiciary's ability to promulgate administrative directives concerning these subjects. Article 26, contained in both agreements, only refers to occupational health and safety in general. Thus, the agreements are not specifically concerned with issues of firearms and law enforcement. The managerial prerogative provisions of the agreements leave the Judiciary's powers unfettered with respect to these subjects.
As to a stay of a court action pending arbitration, N.J.S.A. 2A:24-4 provides:
In an action brought in any court upon an issue arising out of an agreement providing for the arbitration thereof, the court, upon being satisfied that the issue involved is referable to arbitration, shall stay the action, if the applicant for the stay is not in default in proceeding with the arbitration, until an *1063 arbitration has been had in accordance with the terms of the agreement.
Since the issue involving the facial constitutional validity of the Act and issues involving managerial prerogatives were not properly referable to arbitration, no stay of plaintiff's action pending arbitration was necessary.

III.
PANJ also contends that because New Jersey judges are overseen by the Chief Justice of the Supreme Court and are subject to transfer, promotion and/or demotion by the Chief Justice, the impartiality of the judges to consider the constitutionality and enforceability of the Act is compromised. PANJ argues that since the Supreme Court, which unequivocally opposed passage of the Act, "controls the entire [j]udicial system," recusal of judges, including Supreme Court justices, is ineffective because the Supreme Court possesses the authority to transfer and reassign judges. PANJ urges that because of "the appearance, if not actual impropriety relating to New Jersey judges adjudicating this matter, the matter should be forwarded to a special master." These arguments are without merit.
Although New Jersey judges are subject to assignment "to the Divisions and Parts of the Superior Court" and transfer "from time to time ... from one assignment to another, as need appears" by the Chief Justice of the Supreme Court, N.J. Const., Art. VI, § 7, ¶ 2, they remain independent. Thus, they are nominated and appointed by the Governor, with the advice and consent of the Senate, N.J. Const., Art. VI, § 6, ¶ 1, and "hold their offices for initial terms of 7 years and upon reappointment shall hold their offices during good behavior." N.J. Const., Art. VI, § 6, ¶ 3.
Judges must remain impartial and independent. Canons 1 and 3A(1), respectively provide in relevant part:
1. A Judge Should Uphold the Integrity and Independence of the Judiciary.
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved....
3. A Judge Should Perform the Duties of Judicial Office Impartially and Diligently
The judicial duties of a judge take precedence over all other activities. Judicial duties include all the duties of the office prescribed by law. In the performance of these duties, the following standards apply:
A. Adjudicative Responsibilities.
(1) A judge should be faithful to the law and maintain professional competence in it. A judge should be unswayed by partisan interest, public clamor, or fear of criticism.
As the Court noted in Matter of Coruzzi, 95 N.J. 557, 563, 472 A.2d 546 (1984), appeal dismissed, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 8 (1984), a judicial removal proceeding:
Society invests its leaders with many powers. No power is greater, nor its responsibilities more awesome, than that given a judge. The power to render final judgment is limited only by the law and the judge's conscience. Society gives this power on condition that judges be independent, trusting them and no one else.
Accordingly, we conclude that an issue involving the facial constitutionality of an *1064 enactment by the New Jersey Legislature is solely subject to determination by New Jersey state courts absent federal court jurisdiction. The "rule of necessity" requires this.
In Coruzzi, supra, the respondent, who was convicted of four counts of bribery, maintained that the Supreme Court should totally disqualify itself. 95 N.J. at 564, 573, 472 A.2d 546. In dismissing this contention the Court said:
[W]e doubt that the New Jersey Constitution in granting the power of removal to "the Supreme Court" (art. VI, § VI, para.4) intended the power to be exercised by a court composed exclusively of judges of other courts. We suspect that even if grounds existed for disqualification of the entire Court, the rule of necessity would nevertheless require that the entire Court hear the matter. See Traction Co. v. Board of Public Works, 56 N.J.L. 431, 439-40, 29 A. 163 (Sup.Ct.1894); New Jersey State Bar v. New Jersey Ass'n of Realtor Bds., 118 N.J.Super. 203, 209, 287 A.2d 14 (Ch.Div.1972); accord United States v. Will, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980).
[Id. at 573, 472 A.2d 546.]
The rule was explained in New Jersey State Bar Ass'n. v. New Jersey Ass'n of Realtor Bds., 118 N.J.Super. 203, 287 A.2d 14 (Ch.Div.1972). There, the plaintiff Bar Association instituted a class action against the defendant Realtors to enjoin them from acts alleged to constitute the practice of law. Id. at 205, 287 A.2d 14.
Asserting bias and prejudice, defendant moved to disqualify the entire New Jersey judiciary as well as the Chief Justice and Associate Justices of the United States Supreme Court from hearing the matter and for the appointment of an impartial panel of lay arbitrators to hear and decide the case. Id. at 204, 287 A.2d 14. In denying the motion, the court stated, in pertinent part:
There is a constitutional limitation upon the right or duty of judges to disqualify themselves. Disqualification must yield to necessity where to disqualify would destroy the only tribunal in which relief could be had and thus preclude determination of the issue. In such case it has been held, consistently, the court must act no matter how disagreeable its task may be.
* * * *
No matter what theory of judicial disqualification is advanced, there can be no disqualification of the entire judicial system. To do otherwise would contravene and erode our Constitution.
[Id. at 209, 211, 287 A.2d 14.]
Even assuming the propriety of reference to a special master or to an arbitrator, any report issued by a special master or an arbitrator's award, would, in all probability, be subject to further judicial proceedings. See R. 4:41-5(b), concerning proceedings to adopt, modify or reject a special master's report, and N.J.S.A. 2A:24-7 with respect to an application for confirmation, vacation or modification of an arbitrator's award.
We conclude that the order of the trial court denying PANJ's motion to dismiss or to transfer to an independent neutral third party was properly entered.

IV.
PANJ also maintains that they were entitled to appeal from: (1) adverse orders entered in this case denying their party defendant status, (2) the orders for summary judgment, and (3) the denial of their motions to compel arbitration and stay the proceedings and to dismiss and/or *1065 to transfer to a third party neutral independent.
In support of these contentions, PANJ urges that intervenors have a right to appeal, that Judge Feinberg endowed them with all rights of a party defendant and that they have joined in the State's notice of appeal. Although plaintiff argues that PANJ's appeal should be dismissed, no motion to dismiss their appeal was made.
Although no order was entered, PANJ was permitted to intervene. Their status as permissive intervenors was confirmed in an order entered in the Law Division on February 4, 2003.
We conclude that once PANJ was permitted to intervene, they became a party to the action. In Wylie v. Hamilton, 365 N.J.Super. 153, 838 A.2d 514 (App.Div.2004), a UM/UIM carrier-intervenor contended that the trial court improperly penalized it because it failed to file for a trial de novo. Id. at 163, 838 A.2d 514. It urged it was "both unnecessary and impossible for it to file for a trial de novo because it had not filed an answer, was not a named defendant in the case and was not given notice of ... [an] arbitration." Ibid. We disagreed, stating:
There is no basis for CNA's argument that it lacked standing as an intervenor to file for a trial de novo. ... To the contrary, CNA, as an intervenor, was a party to the case, fully participating in the discovery process and the Superior Court arbitration. Whether CNA was a "named defendant" is irrelevant; ... [Ibid.]
In UFJ Bank v. J & A Int'l Corp., 354 N.J.Super. 542, 545, 808 A.2d 173 (Ch.Div.2002), the court addressed the issue of whether a party who had only moved to intervene, "appeared in the action" prior to granting of the motion. Answering that question in the negative, the court quoted from Mutual Produce, Inc. v. Penn Cent. Transp. Co., 119 F.R.D. 619 (D.Mass.1988), stating:
Here, the plaintiffs and defendants together have sought to dismiss their cases under Fed.R.Civ.P. 41(a)(1)(ii), which permits all parties to an action to agree to a dismissal without further action by the court. Intervenors were not named parties when plaintiffs and defendants filed their stipulations of dismissal, nor did their filing of a motion to intervene give them party status. Indeed, motions to intervene are not granted automatically, nor does their filing constitute an automatic stay. Rather, the moving party must satisfy the court that it has met the four elements required for a motion to intervene to be granted. The stipulations of dismissal were docketed and became effective before that process had an opportunity to take place. The intervenors, therefore, were not "parties who have appeared in the action." See District of Columbia v. Merit Systems Protection Bd., 762 F.2d 129, 132 (D.C.Cir.1985) ("Intervenors under Rule 24(a)(2) ... are normally treated as if they were original parties once intervention is granted.")
[Id. at 546, 808 A.2d 173.]
Similarly, as noted in New York News v. Newspaper & Mail Deliverers' Union, 139 F.R.D. 291, 292-93 (S.D.N.Y.1991), aff'd, 972 F.2d 482 (2d Cir.1992), "[u]nder the Federal Rules,[1] however, once a motion for intervention has been granted, the intervenor is treated as if he or she were an original party. 7C [Charles Alan] Wright and [Arthur R.] Miller, [Mary Kay Kane,] *1066 Federal Practice and Procedure, § 1920 at 488."
In a bankruptcy context, "permission to intervene as of right endows the intervenor with appellate standing to challenge an adverse judgment entered in ... [an] adversary proceeding." In re Thompson, 965 F.2d 1136, 1141 (1st Cir.1992). Also, as noted in 15A Wright, Miller & Cooper, Federal Practice and Procedure, Jurisdiction 2d, § 3902.1 (1992), "persons granted intervention in the trial court become parties, and ordinarily have standing to appeal according to the rules that govern any other party."

V.
PANJ also argues that as an interested person affected by the outcome of plaintiff's declaratory judgment action, they should have been named a defendant in accordance with N.J.S.A. 2A:16-50, the Uniform Declaratory Judgments Act.
In denying PANJ's application to be named party defendants, Judge Feinberg found that although PANJ had been granted intervenor status, they had not demonstrated the existence of a justiciable controversy for which they should have been granted defendant status, and they had not demonstrated that they held a position that could not be adequately represented by the State.
N.J.S.A. 2A:16-56 provides that "[w]hen declaratory relief is sought, all persons having or claiming any interest which would be affected by the declaration shall be made parties to the proceeding." Although it requires that those "persons having or claiming any interest" be "made parties to the proceeding," it does not require that they be denominated plaintiff or defendant.
Moreover, PANJ was granted full party status by being named as intervenors. Therefore, any failure to designate it a defendant was of no practical consequence.

VI.
PANJ also asserts the trial court erred in dismissing their counterclaim because there was no oral argument on that issue and no part of the court's December 19, 2003 written decision was dedicated to discussing the dismissal of counts two, three and four of their counterclaim.
Counts two and three of PANJ's counterclaim recited portions of the Act and demanded injunctive relief requiring its implementation. Count four of the counterclaim recited Article 26 of the collective bargaining agreements relating to health and safety, alleging that plaintiff's failure to implement the Act puts probation officers in significant personal danger and demanded injunctive relief requiring implementation of the Act.
Judge Sapp-Peterson heard oral argument directed at the constitutionality of the Act. Her December 19, 2003 opinion declared the Act unconstitutional. The necessary implication of that ruling was the dismissal of those counts of PANJ's counterclaim demanding implementation of the Act, as that determination left nothing to implement.
The judge also heard oral argument with respect to PANJ's application to compel arbitration. In denying that motion, the judge considered Article 26 of the collective bargaining agreements and found that the matter was not an appropriate subject for arbitration. By implication, the judge found no connection between the collective bargaining agreements and the Act.

VII.
Lastly, PANJ argues that summary judgment was premature because it was *1067 denied an opportunity to conduct discovery with respect to acquiring information regarding judges who hold gun permits, the Supreme Court's lobbying effort against the Act and the depth of the potential conflict of interest "which exists in the Judiciary ruling on an action instituted by the Judiciary."
However, the fact that some judges may have permits to carry weapons is irrelevant to the core issue herein involving the constitutional validity of the Act. There is also no dispute that the Judiciary lobbied against passage of the Act and will, by necessity, sit in judgment of it. In short as to these subjects, discovery is irrelevant. As we noted in Minoia v. Kushner, 365 N.J.Super. 304, 307, 839 A.2d 90 (App.Div.2004), "while ... [a] decision on a summary judgment should be withheld until completion of discovery, nevertheless, discovery need not be undertaken or completed if it will patently not change the outcome."
Affirmed.
NOTES
[1] New Jersey court rules are based on the Federal Rules of Civil Procedure. Freeman v. Lincoln Beach Motel, 182 N.J.Super. 483, 485, 442 A.2d 650 (Law Div.1981).